UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

| | |
|---|---|
| In re:<br><br>NESHTI S. MORADI and<br>ATABAK MOHABATTI SEISAN,<br><br>Debtors.<br><br>RODRIGUEZ REMODELING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>NESHTI S. MORADI and<br>ATABAK MOHABATTI SEISAN,<br><br>Defendants. | Chapter 13<br>Case No. 17-20602<br><br><br><br><br>Adv. Proc. 18-02001 |

**MEMORANDUM OF DECISION**

Plaintiff Rodriguez Remodeling, LLC (the "Plaintiff") seeks a judgment of nondischargeability under 11 U.S.C. § 523(a)(2)(A)[1] with respect to a $65,934.86 default judgment (the "Default Judgment") awarded in its favor by an Arizona state court (the "State Court") against Neshti S. Moradi and Atabak Mohabatti Seisan (collectively, "the Defendants"), plus interest at the Arizona statutory rate of 5.25% per annum.[2] The Defendants seek an award of fees and costs under § 523(d). An evidentiary hearing took place on May 1, 2019. Both Defendants testified, as

---

[1] References to statutory section numbers are to the Bankruptcy Reform Act of 1978, as amended, at 11 U.S.C. § 101, *et seq.* (the "Code").

[2] At the outset of the evidentiary hearing in this matter, the Court *sua sponte* dismissed Count II of the Plaintiff's November 9, 2018 amended complaint (the "Amended Complaint"), which sought a determination of nondischargeability under § 523(a)(6). As the Court explained on the record, such a cause of action is not, as a matter of law, ripe for adjudication during the pendency of the Defendants' chapter 13 case. *See* § 1328(a)(2). *See also, Ambassadors Travel Services, Inc. v. Liescheidt (In re Liescheidt)*, 404 B.R. 499, 504-505 (Bankr. C.D. Ill. 2009). As a result, the only cause of action currently before this Court is the § 523(a)(2)(A) claim.

did Alfonso Rodriguez, a principal of the Plaintiff, who testified through an interpreter. The parties also jointly admitted several exhibits, including the entire transcript of the October 1, 2018 telephonic deposition of Corina Stose who, during the relevant time period, was an escrow branch manager for Security Title Agency ("Security Title"), the company which conducted the closing of the sale of the Defendants' property. The Court took the matter under advisement following the hearing.

Upon consideration of the testimony and after reviewing the evidence, pleadings, joint pretrial statement, factual stipulations, and closing arguments,[3] the Court will enter judgment in favor of the Defendants on the Plaintiff's § 523(a)(2)(A) claim and will deny the Defendants' request for fees and costs under § 523(d).

## I.    Jurisdiction and Venue.

The Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a) and 1334 and the United States District Court for the District of Maine Local Rule 83.6(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue here is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] The Plaintiff commenced this adversary proceeding by filing a complaint on January 20, 2018 seeking a determination that its claim, premised upon the Default Judgment, is nondischargeable under §§ 523(a)(2)(A), (a)(4) and (a)(6) (Docket Entry ("D.E.") 1) (the "Complaint"). The Defendants answered the Complaint on February 9, 2019 (D.E. 5) (the "Answer"). Subsequently, the Plaintiff filed the Amended Complaint which eliminated the § 523(a)(4) cause of action but included additional factual allegations (D.E. 9). The Plaintiff never sought leave to file the Amended Complaint and the Defendants never answered it. At the hearing, the parties represented that the Plaintiff filed the Amended Complaint with the Defendants' consent. They further requested that the Court deem as denied any new factual allegations contained in the Amended Complaint which were not explicitly addressed in the Answer or agreed to by the Defendants in the stipulated facts set forth in the Joint Pretrial Statement filed by the parties on March 21, 2018 (D.E. 6) and the Plaintiff's Stipulations of Facts filed on April 18, 2019 (D.E. 26) (collectively, the "Stipulated Facts"). As a result of these representations and requests by the parties, the Court will only consider the causes of action and factual allegations set forth in the Amended Complaint, will treat the admissions and denials contained in the Answer as admissions and denials to any corresponding allegations set forth in the Amended Complaint, and shall deem denied any allegations contained in the Amended Complaint which were not previously addressed in the Answer or the Stipulated Facts.

## II.     Background.

Before filing for bankruptcy and after losing a home in Maine to foreclosure, the Defendants moved to Arizona. While there, both Defendants developed addictions; drugs for Mr. Seisan and gambling for Mrs. Moradi. These conditions took a severe toll on the family and their finances. In the fall of 2015, once again facing foreclosure and worried about their children, the Defendants resolved to sell their home at 1217 North 67th Street, Mesa, Arizona (the "Property") and return to Maine. They knew, however, that in order to sell the Property, they would need to finish a remodeling project Mr. Seisan had begun but did not complete. The Defendants sought estimates from several contractors, including Mr. Rodriguez, on behalf of the Plaintiff. Although the Plaintiff's quote was substantially higher than those of other contractors, it was the only one which allowed the Defendants to defer payment. Despite believing that the estimate was unreasonably high, the Debtors accepted it because they did not have the funds to complete the repairs until the Property sold.

On October 19, 2015, the parties executed an agreement which provided that the Plaintiff would perform certain services listed on Invoice 3391, attached to the Contractor Agreement as Exhibit A, in exchange for payment by the Defendants of $22,500.00 (the "Contractor Agreement"). The agreement stated that the work was to be substantially completed on or before November 19, 2015 and payment would be due upon the sale of the Property. A letter of intent, signed by Mrs. Moradi on the same date included the following language:

> Payment should be rendered immediately to Rodriguez Remodeling in the total contract amount of Twenty two thousand five hundred dollars when either of one of two scenarios occur. The first scenario being that the property is sold. The second scenario is that the home owner decides to maintain ownership of the property for an extended period of 4 months.[4]

---

[4] Even though the Defendants continued to own the Property more than eight months after they signed the Contractor Agreement and the letter of intent, the Plaintiff did not argue that the balance ever became due before the sale of the

Although the Contractor Agreement and the letter of intent are two separate documents and neither references the other, their terms do not conflict and the parties agree that, together, they establish the terms on which the Defendants hired the Plaintiff. Accordingly, the Court refers to the Contractor Agreement and the letter of intent together as the "Contract."

Mr. Rodriguez testified that he agreed to defer payment because he felt sorry for the Defendants who, in turn, testified that they would never have been able to pay for the repairs without the proceeds from the sale of the Property. The Contract stated that work was to commence on or before October 19, 2015 and would be completed on or before November 19, 2015. Mr. Rodriguez testified he was not sure when the Plaintiff began working on the Property, but he believes it was about a week after the Contract was signed. The Defendants testified that work commenced before the parties signed the Contract. At some point, the parties added $790.00 in services to the Contract through a change work order.

Before the hearing, the parties stipulated that the Plaintiff completed the work required of it under the Contract and the change work order on or about November 19, 2015, which was the deadline under the Contract. During the hearing, Mr. Rodriguez testified that although the Defendants asked the Plaintiff to perform additional services, those services fell outside the scope of the Contract and, concerned about increasing the Plaintiff's exposure in the event of nonpayment by the Defendants, Mr. Rodriguez referred them to other contractors. The Defendants testified differently. Notwithstanding their pretrial stipulations to the contrary, both Mrs. Moradi and Mr. Seisan testified that the Plaintiff's services were both substandard and incomplete. Mr. Seisan testified that the Property did not initially pass the inspection for the sale of the Property

---

Property on June 30, 2016. Therefore, without making any determination as to the meaning or validity of the "second scenario," this opinion focuses on the sale of the Property and any reference herein to payment becoming due under the Contractor Agreement, as modified by the "letter of intent," refers to the "first scenario," i.e., the June 30, 2016 sale of the Property.

4

because the Plaintiff failed to properly complete the work provided for in the Contract. In addition, Mrs. Moradi stated that the Plaintiff took advantage of the Defendants "to some degree." Despite these criticisms, both Defendants claimed that they never wavered in their intention to pay the Plaintiff and Mr. Seisan even maintained that the Plaintiff's services increased the value of the Property.

According to Mr. Rodriguez, at some point between October 19, 2015 and November 9, 2015, the Defendants promised that they would begin making weekly payments but never made any of those payments. The Defendants disputed Mr. Rodriguez's testimony. According to Mrs. Moradi, she could not and would not have promised to make weekly payments that her family's cash flow could not support. She testified that the lack of income was the sole reason that the Defendants entered into the more expensive contract with the Plaintiff since the Plaintiff was the only contractor willing to defer payment until the sale of the Property.

The Plaintiff offered no evidence other than Mr. Rodriguez's testimony that the parties verbally amended the terms of the Contract to provide for weekly payments. Regardless, Mr. Rodriguez testified that the Defendants' failure to honor these new payment terms eroded his trust in them. So, on November 9, 2015, the Plaintiff recorded a Notice and Claim of Lien with the Maricopa County Recorder which claimed a mechanic's and materialmen's lien against the Property to secure payment in the amount of $22,500.00 (the "Lien").

Mr. Rodriguez testified that a displeased Mrs. Moradi called him after she discovered the existence of the Lien. According to Mr. Rodriguez, Mrs. Moradi accused him of fomenting discord between the parties by the imposition of a lien on the Property. Mrs. Moradi, on the other hand, maintained that she was not concerned about the Lien because she believed the Plaintiff was within its rights to ensure that it would be paid at closing.

5

Regardless, on May 14, 2016, the Defendants entered into a contract in which they agreed to sell the Property for $280,000.00.  Mr. Rodriguez testified that in the weeks leading up to the closing, Mrs. Moradi told him on one or more occasions to "cross his fingers" because the Defendants expected a sale to close soon which would net sufficient proceeds to pay the Plaintiff in full.  Mr. Rodriguez also testified that that Mrs. Moradi misinformed him of the closing date by telling him that it was one week later than the actual closing date.

On or about June 10, 2016, Mrs. Moradi contacted Security Title and alerted them of the Lien.  On that same day, she contacted Mr. Rodriguez and informed him that Security Title could not locate the Lien.  Mrs. Moradi also testified that Mr. Rodriguez told her he was not worried because Security Title would make sure the Plaintiff was paid at closing.

Mr. Rodriguez's recollection of that conversation differs.  He testified that Mrs. Moradi asked him not to "renew" the Lien because doing so would delay the closing which, in turn, would defer payment to the Plaintiff.  Mr. Rodriguez also testified that he was doubtful that the Defendants would pay but he ultimately chose not to renew the Lien in reliance upon Mrs. Moradi's assurances.

Notwithstanding Mr. Rodriguez's testimony, the parties submitted into evidence an e-mail that Alma Rodriguez, Mr. Rodriguez's daughter and the Plaintiff's office manager, sent to Mrs. Moradi on June 10, 2016 at 5:45 p.m. which apparently was a response to Mrs. Moradi's request for additional information about the Lien.  The e-mail indicated the date the Lien was recorded, the name of the company which recorded it, and the documentation and order number associated with the Lien.  It also stated that: "[t]he title company should be able to search it with the information I will be providing you."  *See* Exhibit J-20.

According to the deposition of Ms. Stose, on or about June 22, 2016, she reviewed a draft settlement statement for the sale of the Property with the Defendants. Although she testified that she carefully reviewed each line of the statement with the Defendants and explained how funds would be disbursed, Mrs. Moradi described the review as rushed. The draft settlement statement itself does not list the debt owed to the Plaintiff as one of the disbursements to be made at closing by Security Title.  Ms. Stose also testified that, while she did not recall the discussion verbatim, she remembered telling the Defendants that Security Title would not pay the Plaintiff at closing because that payment was not necessary to deliver free and clear title to the purchasers of the Property at the closing.  The Defendants, on the other hand, maintained that they understood that the Plaintiff would be paid at closing notwithstanding their knowledge at the time that the Lien had lapsed.

Also, on June 22, 2016, the Defendants executed the Owner's Affidavit and Indemnity and Escrow Closing Instructions which provided in part:

> There are NO contracts or arrangements for making any repairs, alterations, construction or other work on the Property.  There are NO unpaid bills or claims for labor or materials and further, NO labor has been furnished including site preparation, nor any materials or equipment have been delivered to the Property in the last 150 days.

See, Exhibit J-8.  The Defendants signed a revised settlement statement on June 30, 2016 which added certain payments owed to contractors who provided flooring and roofing services to the Defendants but, again, the Plaintiff's bill was not included.

On the witness stand, Mrs. Moradi conceded that neither settlement statement listed the debt owed to the Plaintiff.  She claimed, however, that she failed to notice, or even understand the implication of, this omission when she reviewed the statements with Ms. Stose.  She testified that her husband and she were "desperate" to sell the Property and that they sought to close the sale as quickly as possible.  At that time, she was struggling to hold her family together while her husband

and she each battled their addictions and struggled with financial woes. The closing was the Defendants' first and, according to Mrs. Moradi, this inexperience led to confusion about the process. She conceded that, in the "hurricane" of events she did not pay close attention to the closing details, and instead relied upon Security Title to pay all of her creditors at the closing.

The closing occurred on June 30, 2016 and on the following day Security Title paid to the Defendants the net proceeds of $135,707.49. Both Defendants testified that they believed that the Plaintiff had been paid at closing. They acknowledged that they never paid any funds to the Plaintiff and, further, that after the closing, Mrs. Moradi quickly gambled away the majority of the sale proceeds.

According to Mr. Rodriguez, he tried to reach the Defendants the day after the date Mrs. Moradi told him the sale would close—which was one week after the sale actually closed—but the Defendants' phones were disconnected and he could not contact them. He went to the Property and discovered the new owners residing there. Mrs. Moradi testified that, after the closing, the Defendants promptly moved their family back to Maine, got new cell phones, and made a clean break with their past in Arizona. Although Mr. Rodriguez characterized this sudden move as an attempt by the Defendants to dodge their liability to the Plaintiff, Mrs. Moradi claimed that her husband and she simply sought to make a fresh start as quickly and fully as possible. Once in Maine, Mr. Seisan entered treatment for his drug addiction and Mrs. Moradi took steps to overcome her gambling addiction, including signing herself out of casinos and attending an addiction support group.

On July 11, 2019, Ms. Stose informed Mrs. Moradi by e-mail that a representative of the Plaintiff stopped by Security Title seeking payment. Ms. Stose asked Mrs. Moradi when the Plaintiff might expect payment and reminded Mrs. Moradi that "[y]ou indicated at signing that

8

you would be paying [the Plaintiff] directly." Exhibit J-12. There is no evidence that Mrs. Moradi ever replied to Ms. Stose's e-mail and Mr. Rodriguez testified that multiple attempts to contact the Defendants post-closing were unsuccessful.

On December 21, 2016, the Plaintiff filed suit in State Court against the Defendants, who were then living in Maine. The Defendants claim that it was only after they accepted service of the complaint that they realized the Plaintiff was not paid at closing. Although they initially managed to retain counsel in the State Court action, their funds ran out during the pleading stage and their counsel withdrew the day after filing an answer to the amended complaint. Without the means to hire new counsel, the Defendants failed to defend themselves against the allegations at any time after filing their answer. On October 17, 2017, the State Court entered the Default Judgment.

### III.    Positions of the Parties

The Plaintiff argues that, at the time the Defendants signed the Contract obligating them to pay the Plaintiff when the Property sold, they had no intention of honoring that promise. As support, the Plaintiff looks to: (1) the Defendants' willingness to enter into a more expensive construction contract solely on the basis that the payment would be deferred until the sale; (2) the Defendants' complaints about the Plaintiff's workmanship; (3) the Defendants' unwillingness to make weekly payments; (4) Mrs. Moradi's dismay upon learning of the Lien and her later request to Mr. Rodriguez that he not "renew" it; (5) Mrs. Moradi's admission that she did not want anything to slow down the sale of the Property; (6) the Defendants' willingness to sign certain closing documents attesting to the fact that all outstanding invoices had been paid while omitting

9

the Plaintiff from the list of closing disbursements; and (7) the Defendants' quick relocation to Maine with no forwarding address coupled with the disconnection of their cell phones.[5]

The Defendants, on the other hand, rely on Mr. Rodriguez's testimony as evidence that even he believed that they intended to pay the Plaintiff when they entered into the Contract, thus depriving the Plaintiff of an essential element of its claim. They further argue that Mrs. Moradi's communications with Security Title support their claim that they always intended to pay the Plaintiff's bill at the closing. In fact, the Defendants maintain that the facts presented before this Court are so far removed from a colorable claim under § 523(a)(2)(A) that they should be awarded damages under § 523(d).

The Plaintiff, not surprisingly, disputes that its claim for nondischargeability is anything other than valid and, therefore, the Defendants should bear the burden of their own fees and costs.

### IV. Legal Standard

A creditor seeking to except a debt from discharge under § 523(a) bears the burden of proving by a preponderance of the evidence that each of the applicable discharge exception elements have been met. *Palmacci v. Umpierrez*, 121 F.3d 781, 787-788 (1st Cir. 1997);

---

[5] The Plaintiff also argues that the Court need not even consider the evidence in this proceeding because the Defendants are collaterally estopped from relitigating the fraud issue after having substantially participated in the State Court case which resulted in a default judgment on several claims, including a count stating a cause of action for fraud. The Court rejects this argument. As the state in which the original decision issued, Arizona's state law governs whether the Defendants are collaterally estopped from litigating the fraud issue in this case. *In re Tacason*, 537 B.R. 41, 50-51 (B.A.P. 1st Cir. 2015). Under Arizona state law, "Collateral estoppel or issue preclusion is applicable when the issue of fact to be litigated was actually litigated in a previous suit, a final judgment was entered, and the party against whom the doctrine is to be invoked has a full opportunity to litigate the matter and actually did litigate it, provided such issue or fact was essential to the prior judgement." *Chaney Building Co. v. City of Tucson*, 148 Ariz. 571, 716 P.2d 28, 30 (1986). See, *Child v. Foxboro Estates, LLC (In re Child)*, 486 B.R. 168 (9th Cir. 2013) (noting two divergent branches regarding the doctrine as applied by Arizona courts but adopting the *Chaney* test because it was issued by the Arizona Supreme Court and has not been overturned). In this case, the Defendants' State Court counsel withdrew after filing an answer to the Amended Complaint. The Defendants could not afford replacement counsel and from that point forward, the Defendants—then pro se, residing in Maine and financially unable to travel back and forth to Arizona—were unable to meaningfully participate in the State Court litigation. The parties did not conduct discovery and the Default Judgment made no actual findings as to the fraud claims other than to generally accept as true the testimony and proof offered by the Plaintiff at a hearing the Defendants did not attend. Based on this record, the Court finds that the Defendants did not have a full opportunity to, and did not actually, litigate the fraud allegations and, therefore, that the doctrine of collateral estoppel does not apply.

*Commerce Bank & Trust Co. v. Burgess (In re Burgess)*, 955 F.2d 134, 136 (1st Cir. 1992); *Bombardier Capital, Inc. v. Baietti (In re Baietti)*, 189 B.R. 549, 553 (Bankr. D. Me. 1995) (*citing Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991)). Courts deciding whether to except a debt from discharge must balance the Code's "fresh start policy" against those provisions designed to ensure that the dishonest debtor is not rewarded. *Palmacci*, 121 F.3d at 786. Ultimately, however, exceptions to discharge are "narrowly construed" and, to prevail on a nondischargeability complaint, creditors must demonstrate that the claim at issue falls "squarely" within the applicable subparagraph of § 523(a). *Id*.

A claimant under § 523(a)(2)(A) must establish by a preponderance of the evidence that he or she is owed a debt ". . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." False pretenses, fraudulent misrepresentation, and actual fraud all share some common characteristics, but they are not identical. Put another way, "[a]n action under § 523(a)(2)(A) involves three distinct categories of misconduct—false pretenses, false representation, or actual fraud—albeit with elements that overlap." *Whitcomb v. Smith*, 572 B.R. 1, 15 (B.A.P. 1st Cir. 2017) (citations omitted).

Turning first to "false pretenses", that term does not necessarily require a written or express representation but, rather, encompasses "a series of events, activities or communications" through which a debtor induces a creditor misled by false or misunderstood circumstances to extend credit or transfer property. *Baietti*, 189 at 553 (*quoting Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990), *partially rev'd on other grounds*, 146 B.R. 269 (D. Colo. 1992)).

As far as the second category of misconduct under § 523(a)(2)(A), a debtor will be liable for false representation, ". . . if (1) he makes a false representation, (2) he does so with fraudulent

11

intent, i.e., 'scienter,' (3) he intends to induce the plaintiff to rely on misrepresentation, and (4) the misrepresentation does induce reliance, (5) which is justifiable, and (6) which causes damage (pecuniary loss)." *Palmacci*, 121 F.3d at 786 (*citing*, 2 F. Harper, et al., *Law of Torts* § 7.1, at 381 (2d ed. 1986); Restatement (Second) of Torts §525 (1977)). With respect to the first element, the debtor must not have intended to perform at the time the promise was made. *Id.* The second element requires an intent to deceive, manipulate, or defraud. *Id.* at 787.

Both "false pretenses" and "false representations" require a creditor to establish a "causal link" between the debtor's act of creating false or misleading circumstances and the creditor's decision to transfer property or provide credit. *Baietti*, 189 B.R. at 556 (*citing Wallingford's, Inc. v. Waning (In re Waning)*, 120 B.R. 607, 612 (Bankr. D. Me. 1990)); *Commerce Bank & Trust Co. v. Burgess (In re Burgess)*, 955 F.2d 134, 140 (1st Cir. 1992). The First Circuit described the two components of causation as follows:

> "The first is cause in fact, which means that [the debtor's] misrepresentations must have 'played a substantial part,' and so were 'a substantial factor,' in affecting [the creditor's] 'course of conduct that result[ed] in his loss.' *See* Restatement (Second) of Torts § 546 & cmt. b. The second is legal cause, which means that [the creditor's] 'loss' must have been one 'reasonably ... expected to result from' his 'reliance' on [the debtor's] misrepresentations. *See id.* § 548A. Foreseeability is the watchword.

*In re Goguen*, 691 F.3d 62, 67 (1st Cir. 2012).

The third basis by which a debt may be declared nondischargeable under § 523(a)(2)(A), "actual fraud", contains the same elements found in the common law definition. *See, Husky Int'l Electronics, Inc. v. Ritz,* 136 S.Ct. 1581, 1586-1587, 194 L.Ed.2d 655 (2016). Specifically, "actual" means that the fraud involves moral turpitude or intentional wrong and "fraud" refers to deception or trickery. *Husky,* 136 S.Ct. at 1586-1587. Unlike "false pretenses" and "false representations," no misrepresentation is necessary, but actual fraud may be premised upon a scheme and is often found to be present in § 523(a)(2)(A) actions when a debtor fraudulently

12

conveys property or receives fraudulently conveyed property. *See, id.* at 1589-1590; *Sauer, Inc. v. Lawson (In re Lawson)*, 791 F.3d 214, 218 (1st Cir. 2015). However, the fraud must be actual and not merely constructive. *See Lawson*, 791 F.3d at 225-226.

### V. Analysis

*A. The Plaintiff's Claim under § 523(a)(2)(A).*

Although the Plaintiff does not explicitly state whether its § 523(a)(2)(A) claim is premised upon "false pretenses," "false representations," or "actual fraud," it argues that, by signing the Contract, which provided that the Defendants would pay the Plaintiff upon the sale of the Property, the Defendants falsely misrepresented their intentions, thereby inducing the Plaintiff to provide services for which they never intended to pay.

Almost immediately, however, this argument faces a factual flaw: none of the evidence presented establishes that the Defendants did not intend to pay the Plaintiff at the time they entered into the Contract. Indeed, even though Mr. Rodriguez was not willing to go so far as the Defendants—who maintained that they had always intended to pay the Plaintiff in full—he testified that he believes that, at the time the Defendants entered into the Contract, their intentions were consistent with their promises to pay.

The Plaintiff points to a number of post-Contract events as evidence of the Defendants' allegedly pre-Contract fraudulent intent but none satisfies the Plaintiff's burden of proof. For one thing, these subsequent events do not rebut Mr. Rodriguez's own testimony regarding the Defendants' intentions at the time they entered into the Contract. Second, to the extent the Plaintiff asserts that these subsequent events also constitute false pretenses or false representations, it failed to establish a causal connection between events which occurred either during or after the Plaintiff

13

completed its work and the amount of damages the Plaintiff seeks. Further, many of these post-Contract events are not properly substantiated by the evidentiary record before the Court.

For instance, the Plaintiff indicates that the Defendants' criticisms regarding the scope and quality of its work support the inference that the Defendants never intended to pay the Plaintiff from the outset. In so arguing, the Plaintiff accuses the Defendants of manufacturing excuses not to pay the Plaintiff by expressing false dissatisfaction with the Plaintiff's services. This argument is not convincing, however. The record is rife with inconsistent stipulations and testimony as to the nature of the Defendants' complaints regarding the quality and scope of work the Plaintiff performed. Regardless, at no point during the evidentiary hearing did the Defendants assert that the Plaintiff did not earn the entire outstanding balance. To the contrary, Mr. Seisan testified that the Plaintiff's services improved the value of the Property and both Defendants testified that the Plaintiff should have been paid in full. Disputes regarding scope and quality of work are so commonplace in contractor-homeowner relationships that, without more, the Court is reluctant to impute criticism by the Defendants as to the quality of the Plaintiff's work with the fraudulent intent required to establish a claim under § 523(a)(2)(A).

The Plaintiff finds more support of its position in the Defendants' failure to comply with their verbal promise to make weekly payments on the account while the work was being performed. However, the sole evidence of this agreement is Mr. Rodriguez's vague and uncorroborated testimony. He did not testify as to any specific events which caused him to seek payment on different terms than those set out in the Contract, nor did he specify when the Defendants verbally agreed to make weekly payments. The Defendants, on the other hand, testified that they have no recollection of the Plaintiff requesting weekly payments and Mrs. Moradi further testified that, even if the Plaintiff had made such a request, she never would have

agreed to such a change in payment terms because the family could not afford to pay anything until the Property sold.  Her testimony is consistent with the Defendants' unchallenged assertion that the primary, if not the sole, reason they contracted with the Plaintiff over other contractors offering lower estimates was to take advantage of the Plaintiff's willingness to defer payment.  Given the evidence presented by the parties, it is unlikely that the cash-strapped Defendants would have agreed to weekly payments after successfully negotiating a Contract which allowed them to postpone the day of reckoning until the sale of the Property.  Accordingly, the Court finds the Defendants' account more credible in this instance.

Even if the Plaintiff established that the Defendants promised to make weekly payments and failed to do so, the Plaintiff did not allege, let alone prove, either reliance or causation with respect to that representation.  In light of Mr. Rodriguez's testimony that he believed the Defendants intended to pay at the time they entered into the Contract, the next earliest false pretense or fraudulent misrepresentation would be the promise to pay weekly.  Accepting Mr. Rodriguez's testimony as true, the Court can ascertain that the Defendants would have made that promise sometime between October 19, 2015 (the date on which the parties executed the Contract) and November 9, 2015 (the date on which the Plaintiff recorded the Lien).  In other words, some portion of the work had already occurred at the time that the Defendants allegedly made the promise to make weekly payments.  In order to prevail on a § 523(a)(2)(A) claim premised on this event, then, the Plaintiff must establish the amount owed for services provided in reliance upon that particular event.  It is difficult for this Court to envision how the Plaintiff could meet this burden when the Plaintiff was already contractually bound to provide those same services under the terms of the original Contract.  Regardless, the Plaintiff did not even allege, not to mention

establish, that any services were provided in reliance upon this alleged promise to make weekly payments.

The Court also finds unpersuasive the Plaintiff's argument that Mrs. Moradi's communications to him regarding the Lien evidences the Defendants' fraudulent intent as of the time they entered into the Contract. This argument is premised entirely upon Mr. Rodriguez's testimony that Mrs. Moradi expressed dismay when she first learned of the Lien's existence and then, later, when she discovered it had expired, begged Mr. Rodriguez not to put another lien on the Property. Mrs. Moradi, however, offered a different account of those conversations. She testified that she was not concerned by the Lien's existence and, later, when she discovered from Security Title that the Lien lapsed, she urged Mr. Rodriguez to take steps to ensure its validity. The credibility of Mrs. Moradi's testimony on this issue is buttressed by the e-mail correspondence documenting her insistence to Security Title that a valid lien existed and her efforts to help Security Title locate the Lien. It is improbable that Mrs. Moradi would have taken these steps if she sought to conceal the Lien's existence. At most, it could be argued that after Mrs. Moradi discovered that the Lien had lapsed, she intentionally signed closing documents that she knew did not provide for payment to the Plaintiff and told Security Title that she would pay the Plaintiff directly even though she never intended to do so. The record does not necessarily support such findings but, even if it did, the Plaintiff's claim under § 523(a)(2)(A) claim would fail once again on the reliance and causation elements because the Plaintiff had already completed its work under the Contract at the time of those particular acts.

Finally, the Plaintiff argues that the Defendants' actions at the time of closing, and immediately thereafter, evidence their fraudulent intent. Specifically, the Plaintiff relies on the omission of the Debt from the closing statements despite the inclusion of amounts due to other

16

contractors, the Defendants' signatures on the Owner's Affidavit and Indemnity and Escrow Closing Instructions certifying that all amounts due for repairs on the Property had been paid, e-mails and deposition testimony by Ms. Stose indicating that the Defendants told her that they would pay the Plaintiff, the Defendants' quick relocation to Maine without a forwarding address, and the termination of their cell phone contracts.  In light of Mr. Rodriguez's own testimony regarding the Defendants' intent at the time they entered into the Contract and the documents evidencing Mrs. Moradi's efforts to disclose the existence of the Lien, the Defendants' actions, at most, could be construed to indicate that, at some point after Mrs. Moradi became aware that the Lien had lapsed, the Defendants attempted to avoid paying the Plaintiff by intentionally omitting it from the settlement statements and then quickly leaving town.  Even if the Court were to interpret these events in this manner, however, the Plaintiff would have the same reliance and causation problems discussed above – the work was already done when these supposedly fraudulent acts took place.

In reviewing the record, however, the Court is unwilling to ascribe a fraudulent intent to the Defendants' actions during and immediately following the closing.  Mrs. Moradi's uncontroverted description of the impact of the couple's financial troubles and addictions on their marriage and children, coupled with her testimony regarding the family's desperation to leave Arizona for a fresh start in Maine, lead the Court to conclude that the Defendants' failure to pay the Plaintiff and their hasty relocation to Maine are more likely attributable to their emotional distress and inattention than any intent to defraud the Plaintiff.

In the end, the Plaintiff simply did not meet its burden to establish by a preponderance of the evidence that the Defendants fraudulently misrepresented their intent to pay the Plaintiff or that they engaged in a series of events, activities or communications by which they induced the

Plaintiff to provide services under false or misunderstood circumstances. Unlike false pretenses and fraudulent misrepresentation, some courts have held that actual fraud does not necessarily require reliance. Had the Plaintiff been able to establish that its version of the events leading up to the closing actually occurred, therefore, it might have been able to establish that the Defendants engaged in a scheme rising to the level of actual fraud. The Court need not reach that determination here, however, because, as discussed above, the Court finds Mrs. Moradi's testimony to be better supported by the record. Accordingly, the Plaintiff's § 523(a)(2)(A) claim fails.

B. *Defendants' § 523(d) Claim.*

Having found in favor of the Defendants on the Plaintiff's § 523(a)(2)(A) claim, the Court must next decide whether they should be awarded their costs and fees under § 523(d). Such a remedy would be appropriate if the Court finds that the Plaintiff's claim for nondischargeability was not substantially justified. Some courts employ a "totality of the circumstances" test to make this determination, while other have adopted a three-part test which probes "whether the action had '(1) a reasonable basis in truth for the facts alleged, (2) a reasonable basis in law of the theory propounded, and (3) a reasonable support in the facts alleged for the legal theory advanced.'" *Bridgewater Credit Union v. McCarthy (In re McCarthy)*, 243 B.R. 203, 208 (1st Cir. B.A.P. 2000) (*quoting Brinker v. Giuffrida,* 798 F.2d 661, 664 (3d Cir. 1986) (interpreting the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), upon which 523(d) was patterned). *Accord American Express Travel Related Servs. Co. v. Baker (In re Baker)*, 206 B.R. 507, 509 (Bankr. N.D. Ill. 1997).

The Court struggles to understand how the Plaintiff continues to premise its § 523(a)(2)(A) action on the assertion that the Defendants did not intend to pay the Plaintiff at the time they entered into the Contract when Mr. Rodriguez—the Plaintiff's own witness—testified otherwise

on the witness stand. As discussed above, the Plaintiff's efforts to bolster its claim by pointing to events leading up to and immediately following the sale of the Property fall short because the Plaintiff did not allege, let alone prove, that those events induced the Plaintiff to continue providing services or that any portion of the debt the Plaintiff seeks to except from discharge is related to the services the Plaintiff provided in justifiable reliance upon those events.

Notwithstanding the Court's conclusion that the Plaintiff's fraudulent misrepresentation argument is without merit, an award of fees and costs to the Defendants under § 523(d) is not warranted. Had the Plaintiff been able to establish that Mr. Rodriguez's account of the events leading up to the closing was the correct version of events, it may have been able to establish a colorable § 523(a)(2)(A) claim premised upon actual fraud. In order to find that Mrs. Moradi's account is the correct version, the Court had to, in many instances, weigh the credibility of conflicting testimony provided by Mr. Rodriguez and Mrs. Moradi. Where a plaintiff pleads sufficient facts and offers evidence in support of those facts but ultimately does not sustain its burden on credibility grounds, it cannot be said that the Plaintiff's prosecution of that case is not substantially justified.

### IV. Conclusion.

For these reasons, the Court enters judgment in favor of the Defendants on the Plaintiff's claim under §523(a)(2)(A) and denies the Defendants' request for fees and costs under § 523(d).

A separate order shall enter.